**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF CALIFORNIA**

| | | |
|---|---|---|
| **CANDY KELLY, et al.,** **Plaintiffs,** v. **EVERETT R. ECHOLS, M.D., et al.,** **Defendants.** | ) | **CIV- F-05-118 AWI DLB** **ORDER ON DEFENDANTS'S MOTION FOR SUMMARY JUDGMENT** (Doc. No. 92) |

This case stems from the dual suicide of a mother, Leisa Kelly ("Leisa") and son, Ryan Kelly ("Ryan"), after they obtained an anti-depressant, Elavil, from the internet. Plaintiff Candy Kelly is the mother of Leisa and grandmother of Ryan. Plaintiff alleges a California state law claim for wrongful death based on negligent provision of Elavil to Leisa and Ryan. Defendants EZRX, L.L.C. ("EZRX"), Frank Hernandez, and Amada Hernandez move for summary judgment. For the reasons that follow, the motion will be granted.

**SUMMARY JUDGMENT FRAMEWORK**

Summary judgment is appropriate when it is demonstrated that there exists no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970); Fortyune v.

American Multi-Cinema, Inc., 364 F.3d 1075, 1080 (9th Cir. 2004). The party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and of identifying the portions of the declarations (if any), pleadings, and discovery that demonstrate an absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007). A fact is "material" if it might affect the outcome of the suit under the governing law. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986); Thrifty Oil Co. v. Bank of America Nat'l Trust & Savings Assn, 322 F.3d 1039, 1046 (9th Cir. 2002). A dispute is "genuine" as to a material fact if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party. Anderson, 477 U.S. at 248; Long v. County of Los Angeles, 442 F.3d 1178, 1185 (9th Cir. 2006).

Where the moving party will have the burden of proof on an issue at trial, the movant must affirmatively demonstrate that no reasonable trier of fact could find other than for the movant. Soremekun, 509 F.3d at 984. Where the non-moving party will have the burden of proof on an issue at trial, the movant may prevail by presenting evidence that negates an essential element of the non-moving party's claim or by merely pointing out that there is an absence of evidence to support an essential element of the non-moving party's claim. See James River Ins. Co. v. Schenk, P.C., 519 F.3d 917, 925 (9th Cir. 2008); Soremekun, 509 F.3d at 984; Nissan Fire & Marine Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1105-06 (9th Cir. 2000). If a moving party fails to carry its burden of production, then "the non-moving party has no obligation to produce anything, even if the non-moving party would have the ultimate burden of persuasion." Nissan Fire & Marine Ins. Co. v. Fritz Companies, 210 F.3d 1099, 1102-03 (9th Cir. 2000). If the moving party meets its initial burden, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually exists. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); Nissan Fire & Marine, 210 F.3d at 1103. The opposing party cannot "'rest upon the mere allegations or denials of [its] pleading' but must instead produce evidence that 'sets forth specific facts showing that there is a genuine issue for trial.'" Estate of Tucker v. Interscope Records, 515 F.3d 1019, 1030 (9th Cir. 2008).

The evidence of the opposing party is to be believed, and all reasonable inferences that

may be drawn from the facts placed before the court must be drawn in favor of the opposing party. See Anderson, 477 U.S. at 255; Matsushita, 475 U.S. at 587; Stegall v. Citadel Broad, Inc., 350 F.3d 1061, 1065 (9th Cir. 2003). Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. See Juell v. Forest Pharms., Inc., 456 F.Supp.2d 1141, 1149 (E.D. Cal. 2006); UMG Recordings, Inc. v. Sinnott, 300 F.Supp.2d 993, 997 (E.D. Cal. 2004). "A genuine issue of material fact does not spring into being simply because a litigant claims that one exists or promises to produce admissible evidence at trial." Del Carmen Guadalupe v. Agosto, 299 F.3d 15, 23 (1st Cir. 2002); see Galen v. County of Los Angeles, 477 F.3d 652, 658 (9th Cir. 2007); Bryant v. Adventist Health System/West, 289 F.3d 1162, 1167 (9th Cir. 2002). Further, a "motion for summary judgment may not be defeated . . . by evidence that is 'merely colorable' or 'is not significantly probative.'" Anderson, 477 U.S. at 249-50; Hardage v. CBS Broad. Inc., 427 F.3d 1177, 1183 (9th Cir. 2006). Additionally, the court has the discretion in appropriate circumstances to consider materials that are not properly brought to its attention, but the court is not required to examine the entire file for evidence establishing a genuine issue of material fact where the evidence is not set forth in the opposing papers with adequate references. See Southern Cal. Gas Co. v. City of Santa Ana, 336 F.3d 885, 889 (9th Cir. 2003); Carmen v. San Francisco Unified Sch. Dist., 237 F.3d 1026, 1031 (9th Cir. 2001). If the nonmoving party fails to produce evidence sufficient to create a genuine issue of material fact, the moving party is entitled to summary judgment. See Nissan Fire & Marine, 210 F.3d at 1103.

## FACTS

EZRX was originally organized as a limited liability company in the State of Florida on April 23, 2003. DUMF No. 4.[1] EZRX conducted its principal place of business in New Jersey, where it was registered as a pharmacy with the Department of Health on September 3, 2003. DUMF No. 5. EZRX also possessed a Federal DEA Number as a pharmacy as of September 23,

[1] "DUMF" refers to Defendants' Undisputed Material Fact. Unless otherwise noted, a citation to a "DUMF" indicates that there is no dispute regarding that fact.

2003.[2] DUMF No. 6.

On or about January 22, 2004, a prescription for Elavil was requested and ordered over the internet in the name of Leisa Kelly. DUMF No. 9. As part of the ordering process, a questionnaire was filled out by one purporting to be Leisa Kelly. See Craig Declaration Exhibit 8. Under the section of the questionnaire that asks about the condition for which the medication is being ordered, "severe depression" is entered. See id. It is not clear whether Leisa or Ryan ordered the Elavil, but the computer belonged to Ryan and the credit card belonged to Leisa. See DUMF Nos. 44-46, 88, 98-100. A prescription in the name of Leisa Kelly for 90 tablets of 150 mgs. of Elavil was electronically routed to EZRX and filled on January 26, 2004, following the transmission of a prescription by Dr. Everett Echols. DUMF No. 10; see also DUMF No. 37, 86. Echols worked for the website RX Medical and would review questionnaires that were filled out by those who accessed the website. See Echols Transcript at 90, 92.[3] Echols had no physical contact and no pre-existing physician-patient relationship with those who accessed the website. See id. Once Echols reviewed and approved a questionnaire, a prescription would be sent to a pharmacy who worked with RX medical. See id. The pharmacy would then fill the prescription. See id. The pharmacy in this case was EZRX. See DUMF No. 10. While working for RX Medical, Echols reviewed approximately 244,000 questionnaires and reviewed between 200 and 1,000 questionnaires per day.[4] See Echols Transcript at 94, 110. In this case, the prescription for Elavil was filled only for use by Leisa. DUMF No. 52, 106. Leisa and Ryan committed suicide on January 30/31, 2004, by ingesting toxic amounts of Elavil. DUMF No. 11.

It appears that both Leisa and Ryan each deliberately and knowingly overdosed with

---

[2]Frank and Amada Hernandez are alleged to be the alter ego of EZRX. There is no indication that the Hernandezes personally participated in the pharmaceutical transaction with Lesia and Ryan.

[3]On October 20, 2004, the North Carolina Medical Board held a hearing regarding Echols. Plaintiff has submitted a certified copy of the transcript of this hearing (hereinafter "Echols Transcript"). At the hearing, Echols was represented by counsel and gave testimony under oath. Defendants make multiple objections to the Echols Transcript. However, the Court finds that the transcript has been properly authenticated and, as sworn testimony, may be considered at summary judgment as a Rule 56(e) affidavit, although the transcript is not signed by Echols. See Fed. R. Evid. 56(e); Curnow v. Ridgecrest Police, 952 F.2d 321, 324 (9th Cir. Cal. 1991).

[4]Echols had his medical licenses revoked by the North Carolina Medical Board based on his approval of Leisa (and/or Ryan's) on-line questionnaire for Elavil. See Echols Transcript at 192.

approximately forty-five times the recommended daily dose, i.e. each took forty-five pills at one time. See DUMF Nos. 54, 108. Had Leisa (and Ryan) taken the Elavil as prescribed, it would not have had significant deleterious effects on her (his) health other than the side effects typically experienced with its use. See DUMF Nos. 53, 107. To a reasonable degree of medical probability, Leisa and Ryan knowingly and purposefully ingested a toxic amount of Elavil for the purpose of committing suicide. See DUMF Nos. 55, 109. The suicides of Leisa and Ryan were voluntary planned acts that were performed with full control of their actions and with full understanding and realization of the physical character, nature, quality, risk, and consequences of suicide. See DUMF Nos. 48, 102. To a reasonable degree of medical probability, there is no evidence suggesting that, in committing suicide, Leisa and Ryan were acting under the influence of an insane, uncontrollable, or irresistible impulse.[5] See DUMF Nos. 50, 104.

Leisa and Ryan were contemplating suicide prior to ordering and receiving the Elavil. See DUMF No. 38, 87; see also DUMF No. 39. Leisa and Ryan planned their dual suicides by researching methods of suicide, and ultimately decided to order Elavil over the internet. DUMF No. 56, 110. Prior to the order of Elavil, Ryan visited a website which listed methods of suicide, including toxic ingestion of amitriptyline (the key component of Elavil).[6] See DUMF Nos. 12, 95. The act of visiting such a website before receiving the Elavil is more than coincidental and reflects conscious planning and not coercion or impulse. See DUMF No. 96. The method of committing suicide by toxic ingestion of Elavil evidences significant planning. See DUMF Nos. 43, 89, 97. Their plan to commit suicide occurred before the Elavil was ordered and received. See DUMF Nos. 57, 58, 87, 111, 112. The act of ordering Elavil over the internet requires

---

[5] There is a dispute whether Leisa and Ryan would have committed suicide even if they had not received the Elavil. Defendants' expert Dr. Garrick opines that the suicides would have occurred. See DUMF Nos. 66, 124. Plaintiff's supplemental expert, and Leisa and Ryan's treating psychiatrist, Dr. Haspel, testified that he did not believe that the suicides were inevitable. See Haspel Depo. at 150. Given this dispute, no determination can be made by the Court regarding the inevitability of Leisa and Ryan's suicides.

[6] Amitriptylene is a medication/substance that has been in use for over 30 years for the treatment of depression and other mental disorders. See DUMF No. 51, 105. Amitriptylene is now less frequently used due to its toxic side effects, especially in overdosage. See Garrick Report at 44. That is, it is used less because of its potential for fatal usage. Haspel Depo. at 145:20-23.

Additionally, most of the DUMF's refer to amitriptylene instead of Elavil. For purposes of this order, the Court views amitriptylene and Elavil as interchangeable. For convenience, the Court will mostly refer to Elavil.

research and planning and involved multiple, voluntary, intervening actions and behaviors. DUMF No. 40. Also, both Leisa and Ryan wrote suicide notes before they commenced their successful suicides. See DUMF Nos. 41, 90, 92-94. Leaving a suicide note represents planning and a consideration of events to occur after one commits the act of suicide; not the actions of impulse, accident or coercion. DUMF No. 42, 91.

To a reasonable degree of medical probability, the Elavil did not create pre-morbid conditions in, or cause or contribute to the intent to commit suicide of, Leisa and Ryan, i.e. Elavil did not cause Leisa and Ryan to commit suicide. See DUMF Nos. 59-61, 113-115. To a reasonable degree of medical probability, other risk factors caused Leisa and Ryan to commit suicide, including psychotic symptoms, drug abuse and dependence, social isolation, self-esteem issues, familial relationships, financial dependence, debilitating anxiety, and separation issues. See DUMF Nos. 62, 116. Of special note, Leisa made persistent and desperate attempts to prevent Ryan from leaving her and attending his senior year of high school, and later college, in the Bay area; the threats to this profound dependence appear to have been the central dynamic theme leading them both to dual suicide. See DUMF Nos. 64, 65, 118.

With respect to Leisa Kelly, Leisa suffered from a longstanding and significant psychiatric disorder as evidenced by: (1) diagnosis and treatment for three years for chronic, relapsing schizophrenia marked by losing touch with reality, hallucinations, paranoia, and mood instability; (2) diagnosis and treatment for three years for depression; (3) an established history of methamphetamine, marijuana, and alcohol abuse; (4) claimed allegations of sexual abuse; (5) confirmed recurring suicidal ideation with at least one known prior suicide attempt in 2000; (6) she reported receiving a diagnosis of dissociative identity disease; and (7) signs of low self-esteem and isolationism. See DUMF No. 13;[7] see also DUMF Nos. 17, 20, 24, 25, 29-36.[8] These manifestations of Leisa's psychiatric disturbance, on an individual basis, are all factors

---

[7]Plaintiff disputes this DUMF by stating that Leisa's clinicians did not necessarily believe that two risk factors reported by Leisa were accurate, childhood sexual abuse and dissociative identity disorder. However, the DUMF does not state that Leisa was sexually abused or that she actually had dissociative identity disorder.

[8]Dr. Haspel in his deposition indicated that Leisa seemed very personable. See Haspel Depo. at 55:9-10.

associated with an increased risk of suicide, and, on a collective basis, demonstrate a significant risk of suicide. DUMF Nos. 14,[9] 27, 28, Although Leisa committed suicide at age 46, she began exhibiting symptoms associated with a psychotic disorder in her teens and early twenties. DUMF No. 16. Further, Leisa had a long history of chronic depression from as early as 1975 to the time of her suicide in 2004. See DUMF No. 18; see also DUMF No. 19. After her attempted suicide in November 2000, Leisa exhibited chronic suicidal ideation up to the time of her completed suicide. DUMF No. 26; see also DUMF No. 47. However, when treated by Dr. Haspel, Leisa had gone "long periods" with relative stability. See Haspel Depo. at 46:3-5.

Similarly, Ryan suffered from longstanding, significant, psychiatric dysfunction, as evidenced by the following: (1) he was diagnosed and treated for nearly two years for major depression; (2) he was diagnosed and partially treated for bipolar disorder type II; (3) he had an established history of methamphetamine, dextromethorphan, marijuana, and alcohol abuse;[10] (4) he demonstrated confirmed severe self-sabotaging behavior; (5) he had confirmed recurring or sporadic (although apparently not chronic) suicidal ideation and at least one known prior suicide attempt in November 2001 (through overdosing on antidepressants); and (6) he displayed considerable negative self-esteem and isolationism. See DUMF Nos. 67, 80; Haspel Depo. at 32:4-8; see also DUMF Nos. 69-72, 76-78, 82. These manifestations of Ryan's psychiatric dysfunction on an individual basis are factors associated with an increased risk of suicide and, on

---

[9] Plaintiff disputes this DUMF through reference to the expert report of Dr. Thomas Haspel, who was Leisa and Ryan's treating psychiatrist. Plaintiff disclosed Dr. Haspel on April 16, 2008, as an expert witness. See Court's Docket Doc. No. 114. The Scheduling Order required Plaintiff to disclose all expert witnesses by March 3, 2008, and permitted the parties to designate supplemental experts on or by May 1, 2008. See Court's Docket Doc. No. 89. The scheduling order required that the written designation of experts be made pursuant to Rule 26(a)(2)(A) and (B), including all information required under those rules. See id.

Defendants object to the report of Dr. Haspel. Defendants' objections are well taken. First, there is no indication that Dr. Haspel's report is sworn or made under oath. See Fed. R. Civ. Pro. 56(e); Williams v. Pierce County Bd. of Commrs., 267 F.2d 866, 867 (9th Cir. 1959) (holding that a document that had no indication that it was sworn or made under oath was no affidavit). "Unsworn expert reports . . . do not qualify as affidavits or otherwise admissible evidence for [the] purpose of Rule 56, and may be disregarded by the court when ruling on a motion for summary judgment." Provident Life & Acc. Ins. Co. v. Goel, 274 F.3d 984, 1000 (5th Cir. 2001). Second, the report does not contain all of the information required by Rule 26(a)(2)(B). Plaintiff has not responded to Defendants' objections. Accordingly, the Court sustain's Defendants' objections to Dr. Haspel's report (Kail Declaration Exhibit 1) and will not consider the report in resolving this motion.

[10] Leisa involved Ryan in drug and alcohol abuse, including introducing Ryan to, and supplying him with, drugs and alcohol. See DUMF Nos. 21-23, 73-75.

a collective basis, demonstrate a significant risk of suicide. See DUMF Nos. 68, 71, 79, 81, 83. Ryan's November 2001 suicide attempt and episodic suicidal ideation thereafter demonstrate that he considered suicide on numerous occasions more than two years before his successful suicide in January 2004. See DUMF No. 84; see also DUMF No. 101. Despite access to psychiatric and therapeutic support[11]: (1) no notable progress had been made in helping Ryan separate and individuate from Leisa; (2) Ryan was inconsistent with therapy and his overall situation worsened; (3) he dropped out of school and became more isolated; (4) he increased alcohol use; and (5) he became increasingly distressed as the time approached for him to leave Leisa and go to college in the Bay area. See DUMF Nos. 64, 117, 119-121, 123.

Separately, Plaintiff admits that Ryan had a biological father, but she also has admitted that she does not know the father's identity. See DUMF Nos. 126-127. Leisa provided a fabricated name on Ryan's birth certificate. See DUMF No. 128.

## I. STANDING FOR THE DEATH OF RYAN

*Defendants' Argument*

Defendants argue that Plaintiff, as the grandmother of Ryan, is not a first level heir under the laws of intestate succession. Parents have priority over more distant relations, such as grandparents, under intestate succession. Plaintiff must establish that she has standing under the wrongful death statute. Thus, she must show that Ryan's biological father predeceased Ryan. However, Plaintiff admits that Ryan has a biological father, but does not know who he is. Further, the name on Ryan's birth certificate was fabricated. Since Plaintiff cannot identify Ryan's father, she cannot show that Ryan's father predeceased Ryan or that she is Ryan's heir.

*Plaintiff's Opposition*

Plaintiff argues that she never knew the name of Ryan's father, but the relationship was "so meaningful" that not even the father's real name was on the birth certificate. A parent can only inherit as an heir from an illegitimate child if certain criteria are fulfilled, as per Probate

[11] Ryan was also deceptive and lied about his situation to his psychiatrist, Dr. Haspel. DUMF No. 122.

Code § 6452. Neither of those criteria have been met. Ryan never met his father and did not know his father's name.[12] Since the requirements of Probate Code § 6452 could not be met by Ryan's father, Ryan's father could not be an heir. Plaintiff is Ryan's heir and has standing.

_Legal Standard_

In California, the cause of action for wrongful death is "a pure creature of the statute" and "'exists only so far and in favor of such person as the legislative power may declare.'" Justus v. Atchison, 19 Cal.3d 564, 575 (1977); Rosales v. Battle, 113 Cal.App.4th 1178, 1182 (2003); Chavez v. Carpenter, 91 Cal.App.4th 1433, 1438-1440 (2001); Fraizer v. Velkura, 91 Cal.App.4th 942, 945 (2001). Standing to sue is governed by California Code of Civil Procedure § 377.60, and the category of persons eligible to bring wrongful death actions is strictly construed. Cal. Code Civ. Pro. § 377.60; Steed v. Imperial Airlines, 12 Cal.3d 115, 119-20 (1974); Bouley v. Long Beach Memorial Medical Center, 127 Cal.App.4th 601, 606 (2005); Chavez, 91 Cal.App.4th at 1438; Fraizer, 91 Cal.App.4th at 945.

Section 377.60 establishes the wrongful death cause of action and delineates who may avail themselves of the action. In relevant part, it reads:

> A cause of action for the death of a person caused by the wrongful act or neglect of another may be asserted by any of the following persons or by the decedent's personal representative on their behalf:
>
> (a) The decedent's surviving spouse, domestic partner, children, and issue of deceased children, or, if there is no surviving issue of the decedent, the persons, including the surviving spouse or domestic partner, who would be entitled to the property of the decedent by intestate succession.
>
> (b) Whether or not qualified under subdivision (a), if they were dependent on the decedent, the putative spouse, children of the putative spouse, stepchildren, or parents. As used in this subdivision, "putative spouse" means the surviving spouse of a void or voidable marriage who is found by the court to have believed in good faith that the marriage to the decedent was valid.

Cal. Code Civ. Pro. § 377.60.

Probate Code § 6402 sets the order of intestate succession under § 377.60. See Chavez, 91 Cal.App.4th at 1440; Frazier, 91 Cal.App.4th at 946. A plaintiff who brings a wrongful death

---

[12] This statement is not supported by citation to any evidence and, therefore, is not established. See Galen, 477 F.3d at 658; Agosto, 299 F.3d at 23.

suit as an heir must establish the absence of issue by the decedent and the entitlement or propriety of the heir to seek recovery under § 377.60, i.e. that the heir actually has standing under § 377.60. See Nelson v. County of Los Angeles, 113 Cal.App.4th 783, 789 (2004); Coats v. K-Mart Corp., 215 Cal.App.3d 961, 969-70 (1989); Jolley v. Clemens, 28 Cal.App.2d 55, 74-75 (1938).

Grandparents are not the "surviving spouse, domestic partner, children, [or] issue of deceased children." See Cal. Code Civ. Pro. § 377.60(a). For purposes of intestate succession, grandparents may recover as heirs if there is no issue of the decedent, no surviving parents of the decedent, and no surviving issue of the decedent's parents. See Cal. Prob. Code § 6402(d). Further, for a parent to recover through the intestate succession provision of California Code of Civil Procedure § 377.60 for the wrongful death of a child who was born out of wedlock, the parent must have (1) acknowledged the child and (2) contributed to the support or the care of the child. See Lozano v. Scalier, 51 Cal.App.4th 843, 846-49 (1996) (interpreting California Code of Civil Procedure § 377.60 and California Probate Code § 6452).

*Discussion*

Plaintiff has the burden of establishing standing at each stage of the proceeding, it is only the quantum of proof that changes as the case progresses. See Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992); Nelson, 113 Cal.App.4th at 789; Coats, 215 Cal.App.3d at 969-70. For Plaintiff to be an heir and have standing under the wrongful death statute, she must account for Ryan's parents. Leisa, of course, died contemporaneously with Ryan. This leaves Ryan's biological father. The undisputed facts establish that Plaintiff does not know the identity of Ryan's father and that Leisa did not place the father's true name on the birth certificate. In support of the undisputed facts, Defendants have cited the following passage from Plaintiff's deposition:

**Q: Did Leisa ever discuss Ryan Kelly's biological father with you?**

A: Not in any detail. I don't recall even what name she gave him. All I knew was that he lived in the Placerville area, and she did not want him involved in Ryan's life; and she was not going to use his name on the birth certificate; and that was all I ever really knew about him from her.

**Q: Is my assumption correct that you never met the biological father or at least you didn't know he was the father?**

A: That's true. I did not meet the biological father.

Kelly Deposition at 32:3-14.

Plaintiff's deposition excerpt is the only evidence that has been submitted to the Court regarding the identity of Ryan's father. The excerpt indicates that Leisa did not want the father involved in Ryan's life and to that end did not even list the father's real name on the birth certificate. Further, Plaintiff did not know who Ryan's father was. Viewing this evidence in the light most favorable to Plaintiff as the non-moving party, it suggests that Ryan's father did not play any role in Ryan's life and did not contribute to the support and care of Ryan. If Ryan's father did not contribute to Ryan's support or care, then he is not an heir as per Probate Code § 6452. If the biological father cannot be an heir, then Plaintiff has standing to sue for Ryan's death under the wrongful death statute. See Cal. Code Civ. Pro. § 377.60; Cal. Prob. Code §§ 6402, 6452; Lozano, 51 Cal.App.4th at 846-49.[13] For purposes of summary judgment, the evidence before the Court creates a genuine issue of material disputed fact regarding Ryan's biological father. Summary judgment on this issue will be denied.

## II. NEGLIGENT PROVISION OF *Elavil*

*Defendants' Argument*

Case law and secondary authorities all confirm that a pharmacy/pharmacist is generally not liable in negligence where an individual willfully commits suicide with drugs sold by the pharmacy/pharmacist because the suicide is typically considered an independent intervening

---

[13] In reply, Defendants cite to *Lewis v. Regional Center of the East Bay*, 174 Cal.App.3d 350 (1985), *Lozano*, and *Estate of Griswold*, 25 Cal.4th 904 (2001), for the proposition that the Probate Code cannot be used in an effort to create standing for a wrongful death claim. However, *Lewis* held that an heir (as defined in the Probate Code) cannot disclaim his rights as an heir so as to create wrongful death standing on a person who is lower on the intestate succession list. See Lewis, 174 Cal.App.3d at 351-55. There is no disclaimer of intestate rights in the case at bar. *Griswold* is a probate case, it is not a wrongful death case. See Griswold, 25 Cal.4th at 907-08. Finally, in the exact pages cited by Defendants to this Court, *Lozano* interpreted the wrongful death statute and Probate Code § 6452. See Lozano, 51 Cal.App.4th at 846-49. Because the father met the requirements of § 6452, the *Lozano* court held that the father was an heir and could sue under the wrongful death statute. See id. Thus, the *Lozano* father used the Probate Code to establish that he was an heir and had standing.

cause. Also, California law recognizes that, when negligent conduct causes injury that causes suicide, the suicide will be considered an intervening, superseding cause if the decedent is not under an uncontrollable impulse and is able to understand the nature of his act and has the power to control his actions. See Tate v. Canonica, 180 Cal.App.2d 898 (1960).

Additionally, in *Speer v. United States*, 512 F.Supp. 670 (N.D. Tex. 1981), a pharmacist was found to be negligent in filling multiple prescriptions for Etrafon. The filling of the prescriptions left the decedent with excessive amounts of Etrafon, which he used to commit suicide. The *Speer* court followed the general rule that a voluntary suicide is an independent cause. Since there was no reason to anticipate that the Etrafon would be used for suicide, voluntary and willful suicide of the decedent broke the chain of causation. The mere sale of a substance that could be used to commit suicide is an insufficient basis to reasonably anticipate suicide.

Here, the rules in *Tate* and *Speer* apply. There is no dispute that both Leisa and Ryan planned their suicides prior to ordering the Elavil and that there suicides were knowingly, willfully, and voluntarily committed, without any uncontrollable impulse. The Elavil was not the legal cause of Leisa and Ryan's suicides. The voluntary suicides of Leisa and Ryan broke any causation as to EZRX for the sale of the Elavil.[14]

*Plaintiff's Opposition*

There is no dispute that Leisa and Ryan planned their suicide and ordered the Elavil to that end. Both Leisa and Ryan were psychologically fragile and should never have been prescribed Elavil. Although there is no case law dealing with on-line pharmacies, the general law respecting pharmacies and institutions responsible for the care and treatment of the mentally ill strongly support imposing liability on Defendants.

Suicide is generally considered an intervening force, but there are exceptions. Where there is a specific duty owed to a decedent, such as imposed by the dramshop act, then suicide is

---

[14]Other arguments are made by Defendants, including that they owed no duty to Ryan and that Frank and Amada Hernandez are not the alter ego of EZRX. Given the resolution of this motion, it is unnecessary for the Court to resolve these arguments.

not an intervening cause. *Tate* is not controlling because the conduct of the defendants in that case caused the decedent to become suicidal. Suicide was generally found to be an intervening cause in *Tate* because suicide was an unforeseeable result of the negligent conduct. Since foreseeability is key, the suicides of Leisa and Ryan were very foreseeable. It was clear to both Dr. Garrick and Dr. Haspel that Leisa and Ryan were at significant risk. "Had Dr. Echols done his due diligence, even a physician of his questionable caliber would have recognized that risk." Plaintiff's Opposition at 12.

*Speer* is distinguishable. It involved the application of Texas law and a hospital patient who overdosed on drugs that he had hoarded. The *Speer* court noted in part that the plaintiff was not able to prove physician negligence. In the case at bar, the North Carolina Medical Board has determined that Echols breached the standard of care. Further, *Speer* teaches that a pharmacist is to exercise reasonable care and will not be held to account for suicide when there is no reason for the pharmacist to anticipate that a substance will be used for suicide. Elavil was an inappropriate choice for Leisa and Ryan given their history.

The case at bar is closer to *Jacoves v. United Merchandizing Corp.*, 9 Cal.App.4th 88 (1992), which involved the premature discharge of a suicidal patient from a hospital, which resulted in the patient purchasing a shotgun and committing suicide. The hospital argued that the decedent's suicide was an intervening cause as per *Tate*. The *Jacoves* court noted that, if the hospital as the decedent's caretaker knew that the decedent was likely to inflict self-harm, then the hospital had a duty to take preventative measures. Further, where the intervening conduct is simply the failure to protect a person from a harm that was directly threatened by the defendant's prior negligence, the intervening conduct will not defeat causation. Since the hospital had reason to know of the decedent's suicidal thoughts, summary judgment was not appropriate for the hospital. In the case at bar, Echols was a treating physician and if he had done as little as contact Dr. Haspel, he would have known not to approve the prescription for Elavil.

Finally in *Ileto v. Glock, Inc.*, 349 F.3d 1191 (9th Cir. 2003), in applying California law, the court confirmed that a general duty of care exists to not place another person in a situation in which the person is exposed to an unreasonable risk of harm through the reasonably foreseeable

conduct of a third person. Whether a duty exists is a question of law, but foreseeability is a question for the jury. There is sufficient evidence for a jury to decide foreseeability in this case.

*Legal Standard*

"[F]or an intervening act properly to be considered a superseding cause, the act must have produced harm of a kind and degree so far beyond the risk the original tortfeasor should have foreseen that the law deems it unfair to hold him responsible." Kahn v. East Side Union High School Dist., 31 Cal.4th 990, 1017 (2003). As a general rule, "suicide – absent insanity – is a new and independent agency which breaks the causal connection between the wrongful act and death, precluding an action under the wrongful death statutes." Tate v. Canonica, 180 Cal.App.3d 898, 914 (1960) (quoting Cauverien v. De Metz, 188 N.Y.S.2d 627, 632 (1959)). Where a "negligent wrong only causes a mental condition in which the injured person is able to realize the nature of the act of suicide and has the power to control it if he so desires, the act then becomes an independent intervening force and the wrongdoer cannot be held liable for the death. On the other hand, if the negligent wrong causes mental illness which results in an uncontrollable impulse to commit suicide, then the wrongdoer may be held liable for the death." Tate, 180 Cal.App.2d at 914. Further, California has recognized that liability for a foreseeable suicide may exist when "a special relationship existed between the suicidal individual and the defendant or [the defendant's] agents." Nally v. Grace Cmty. Church, 47 Cal.3d 278, 293 (1988). A special relationship has been found between a suicidal individual and his treating physician/psychiatrist and hospital. See id.; Meier v. Ross Gen. Hosp., 69 Cal.2d 420, 423-24 (1968). When a sufficient special relationship exists, the defendant has a duty to prevent a foreseeable suicide. See Nally, 47 Cal.3d at 293. Where the defendant breaches his duty to prevent a foreseeable suicide, the defendant will be liable for a resulting suicide. See id.; Meier, 69 Cal.2d at 423-24; see also Jacoves v. United Merch. Corp., 9 Cal.App.4th 88, 105-06, 111 (1992); cf. Kahn, 31 Cal.4th at 1017. Additionally, California recognizes that "a person owes a duty of care not to provide a dangerous instrumentality to an individual whose use of the instrumentality the supplier knows, or has reason to know, will result in injury." Jacoves, 9 Cal.App.4th at 116. Thus, "one is liable for injuries arising out of the negligent entrustment of a dangerous

instrumentality to a person who the supplier knows, or has reason to know, is a danger to himself or herself or others." Id. In the context of suicide, where the supplier of a dangerous instrumentality knows or has reason to know that an individual is reasonably likely to use the instrumentality to commit suicide, the supplier has a duty to refrain from supplying that instrumentality to the suicidal individual. See id. at 118-19.

With respect to the liability of a pharmacist/pharmacy who sells drugs to one who uses them to commit suicide, most courts that have addressed the issue have found that the suicide is an intervening superseding cause that extinguishes liability. See 25 Am.Jur.2d *Drugs and Controlled Substances* § 245 (2004); Annotation, *Druggist's Civil Liability for Suicide Consummated with Drugs Furnished by Him*, 58 A.L.R. 3d 828 (1974); e.g., Maloney v. Badman, 938 A.2d 883, 889 (N.H. 2007); Runyan v. Reid, 510 P.2d 943, 949-50 (Okla. 1973); e.g. also Hooks Superx, Inc. v. O'Dell, 642 N.E.2d 514, 520-21 (Ind. 1994). The rule has been described as follows:

> The voluntary, willful act of suicide of an insane person, who knows the purpose and physical effect of his act, is such a new and independent agency as will not come within and complete a line of causation from a defendant's alleged negligent act in making sale of a substance or instrumentality with which human life may be taken, when there is nothing in the condition or circumstances to indicate to the seller that the substance or instrumentality will be used for such purpose. Death by self-destruction is not a result naturally and reasonably to be expected, solely, from the sale of substances or instrumentalities with which human life can be taken.

Runyan, 510 P.2d at 950 (quoting Reisbeck Drug Co. v. Wray, 39 N.E.2d 776, 781 (Ind. Ct. App. 1942)); see Speer v. United States, 512 F. Supp. 670, 679-80 (N.D. Tex. 1981). In other words, ""'[l]iability may be imposed, if at all, only when the pharmacist (or seller of the instrumentality used by the decedent to commit suicide) had reason to expect that the drugs (or instrumentality) would be used to commit suicide." Maloney, 938 A.2d at 889.[15]

The Court is unaware of any California case that addresses a pharmacist's/pharmacy's liability for a suicide committed with drugs furnished by the pharmacy. However, considering

---

[15] *Maloney* suggests that a violation of a statute regulating the sale of narcotics by pharmacists may also form a basis of liability for a suicide. See Maloney, 938 A.2d at 888. However, such a theory has not been developed by Plaintiff. Thus, the Court expresses no opinion about this possible exception.

*Nally*, *Jacoves*, and *Tate*, the Court sees no reason why California would reject the rule as expressed in cases like *Maloney* and *Runyan*. Accordingly, the Court believes that California would follow the general rule that a pharmacist/pharmacy is not liable for the death of an individual who knowingly and voluntarily commits suicide with drugs furnished by the pharmacist/pharmacy (because the suicide is a superseding, intervening cause) unless the pharmacist/pharmacy knew or had reason to know that the drugs would be used to commit suicide.

Discussion

Plaintiff makes a number of unsupported assertions in her opposition, but she has not adequately met her burden of presenting evidence to the Court that creates genuine material disputes.

Initially, there is no evidence to indicate that Leisa and Ryan were under some form of irresistible impulse or compulsion when they committed suicide. See DUMF Nos. 50, 104. The evidence establishes that the suicides were voluntary and performed with a full understanding and realization of the physical character, nature, quality, risk and consequences of the act of suicide. See DUMF Nos. 48, 102. Thus, the suicides of Leisa and Ryan were knowingly and voluntarily committed.[16] See Tate, 180 Cal.App.3d at 914. The general rule that suicide is an intervening, superseding cause applies unless Plaintiff can establish an exception.

Plaintiff's argument regarding foreseeability of suicide, which the Court will view as an argument that EZRX knew or had reason to know that Leisa and Ryan would use the Elavil to commit suicide, focuses on the conduct of Echols. Plaintiff emphasizes the lack of due diligence on the part of Echols for not contacting Dr. Haspel or attempting to learn about Leisa and Ryan's histories. However, whether Echols should have contacted Dr. Haspel or requested Leisa and Ryan's records, and from that learned or should have learned that Leisa and Ryan would likely use the Elavil to commit suicide, speaks only to Echols. Plaintiff has not presented evidence that

[16] Also, the evidence shows that suicidal mindsets were already established within Leisa and Ryan prior to EZRX filling the prescription; EZRX did not cause any suicidal ideation within Leisa and Ryan. See DUMF Nos. 57-61, 78, 111-115.

Echols was an employee or agent of EZRX or that Echols's knowledge can somehow be appropriately attributed to EZRX.

Similarly, although not in the body of the opposition brief, in response to DUMF No. 51, Plaintiff cites to the deposition of Dr. Haspel. In discussing the questionnaire, Dr. Haspel stated that listing "severe depression" as the reason for requesting Elavil should "be an indicator to a prescribing physician that [Elavil] is not indicated to be used[.]" Haspel Depo. at 146:6-12; see also Haspel Depo. at 145:24-146:5 (stating that it was a "terrible medical mistake" to prescribe 90 tablets of 150 mg. of Elavil to Leisa). Assuming that Dr. Haspel means that "severe depression" and a request for 90 tablets of 150 mg. of Elavil raises a significant possibility of suicide, that testimony is directed against "the prescribing physician" Echols; it is not directed against the pharmacy. There is no evidence that EZRX saw the questionnaire or knew that 90 tablets of Elavil was requested by someone purporting to have "severe depression." Further, there is no evidence that, even if EZRX knew the contents of the completed questionnaire, a reasonable pharmacist/pharmacy would have known that suicide was a realistic risk.

Plaintiff's reliance on *Jacoves* is not persuasive. The psychiatric hospital in that case undertook the care and treatment of an individual who was schizophrenic, had just attempted suicide, and who remained suicidal. See Jacoves, 9 Cal.App.4th at 97-99. The hospital was specifically and affirmatively trying to treat the decedent's suicidal ideation/tendency, and there was evidence that the hospital had information that the decedent was still suicidal when he was discharged. See id. at 98-99, 106. This is different from the circumstances of the case at bar. In this case, EZRX was a pharmacy that filled a prescription. It did not attempt to shape the care or treatment plan of Leisa and Ryan, it did not consult in the care or diagnosis of Leisa and Ryan, and it did not house and monitor Leisa and Ryan. Plaintiff has not shown that a "special relationship" existed between EZRX and Leisa and Ryan. Cf. Nally, 47 Cal.3d at 293; Meier, 69 Cal.2d at 423-24 ; cf. also Jacoves, 9 Cal.App.4th at 97-99, 105-06. Echols did treat Leisa and Ryan when he prescribed 90 tablets of Elavil, but no evidence has been presented to the Court such that Echols's conduct could be imputed to EZRX. Further, unlike the hospital in *Jacoves*, no evidence indicates that EZRX knew that Leisa and Ryan were suicidal when the prescription

for Elavil was filled. Cf. Jacoves, 9 Cal.App.4th at 98-99, 106. Again, there has been no evidence presented to the Court that EZRX knew that Leisa and Ryan were suicidal when they ordered the Elavil.

With respect to *Ileto*, that case does discuss duty and intervening causes, but it does not discuss suicides or pharmacists/pharmacies. The general rule regarding suicide and pharmacies/pharmacists is that liability is only imposed for a suicide when the pharmacist/pharmacy knew or had reason to know that the drugs would be used to commit suicide. In other words, there is a duty by a pharmacist/pharmacy to not provide dangerous drugs to one who the pharmacist/pharmacy knows or has reason to know is suicidal. Plaintiff has not shown that a different duty is applicable.

The evidence presented to the Court demonstrates that Leisa and Ryan suffered from significant psychological problems and were in a fragile and suicidal state. The evidence also suggests that Echols approved hundreds of on-line prescriptions, should have investigated Leisa's history before prescribing 90 tablets of Elavil, and should not have prescribed 90 tablets of 150 mg. of Elavil to someone who wrote that she had "severe depression." However, Plaintiff has not shown how Echols's conduct and knowledge can be imputed to EZRX. Plaintiff has not shown that EZRX, as the pharmacy, either knew or had reason to know that Leisa (and Ryan) would use the Elavil to commit suicide. Further, Plaintiff has not shown that a special relationship existed between Leisa and Ryan and EZRX. Because the tragic suicides of Leisa and Ryan were knowing and voluntary acts, and because no evidence shows that EZRX knew or had reason to know that it was supplying Elavil to suicidal individuals, Leisa and Ryan's suicides are intervening superseding causes. See Speer, 512 F.Supp. at 679-80; Maloney, 938 A.2d at 889; Runyan, 510 P.2d at 950; Tate, 180 Cal.App.3d at 914; Reisbeck 39 N.E.2d at 781; 25 Am.Jur.2d *Drugs and Controlled Substances* § 245; 58 A.L.R. 3d 828. Summary judgment in favor of Defendants is appropriate.[17]

---

[17] Since EZRX is not liable for Leisa and Ryan's suicides due to a failure of causation, see Runyan, 510 P.2d at 950, there is no injustice for not piercing the corporate veil. See Tucker Land Co. v. California, 94 Cal.App.4th 1191, 1202 (2001) (". . . there must be an inequitable result if the acts in question are treated as the those of the corporation alone."); Tomaselli v. Transamerica Ins. Co. 25 Cal.App.4th 1269, 1285 (1994) ("Alter ego

## III. UNSERVED DEFENDANTS

A review of the Court's docket shows that Everett Echols, Tom Chapman, and RX Medical Services Corp. are named defendants. The active complaint is the Second Amended Complaint ("SAC"), which was filed on February 3, 2006. See Court's Docket Doc. No. 50. Echols, Chapman, and RX Medical have not been served with the SAC. Rule of Civil Procedure 4(m) reads, "If a defendant is not served within 120 days after the complaint is filed, the court – on motion or on its own after notice to the plaintiff – must dismiss the action without prejudice against that defendant or order that service be made within a specified time." Significantly more than 120 days have passed since the SAC was filed. Within 14 days of service of this order, Plaintiff is to either stipulate to the dismissal of all unserved defendants or show cause why the Court should not dismiss all unserved defendants.

## CONCLUSION

Defendants have moved for summary judgment on the negligence and alter ego claims against them. In part, Defendants have argued that Plaintiff does not have standing to sue for the death of Ryan. However, the evidence, when viewed in the light most favorable to Plaintiff, indicates that Leisa did not want Ryan's father to play any role in Ryan's life, a false name was used on the birth certificate, and Plaintiff has never met Ryan's father and she does not know who he is. This evidence is sufficient at summary judgment to raise a genuine issue as to whether Ryan's father ever supported or cared for Ryan. If the father did not, he cannot inherit from Ryan as an heir and Plaintiff would have standing. Summary judgment on the issue of standing to sue for Ryan's death is denied.

With respect to Plaintiff's negligence claim, Plaintiff has failed to present evidence or develop an exception to the general rule that suicide is an intervening superseding cause when a decedent commits suicide with drugs furnished by a pharmacist/pharmacy. Plaintiff has not provided evidence that a special relationship existed between Leisa and Ryan and EZRX and

---

is a limited doctrine, invoked only where recognition of the corporate form would work an injustice to a third person."). Thus, there is no need to address the claim that Frank and Amada Hernandez are EZRX's alter ego.

EZRX was not monitoring, treating, or caring for Leisa and Ryan. Plaintiff has also not presented evidence that EZRX knew or had reason to know that Leisa and Ryan would use the Elavil to commit suicide. The arguments and evidence presented by Plaintiff focuses on Echols and what Echols should have done or should have recognized. The evidence does not focus on EZRX or show how Echols's conduct or knowledge can be imputed or attributed to EZRX. Thus, Plaintiff has not presented sufficient evidence that EZRX knew or had reason to know that the Elavil dispensed to Leisa and Ryan would be used to commit suicide. Summary judgment in favor of Defendants on this claim is appropriate.

Finally, there are three unserved defendants in this case. Substantially more than 120 days have passed since the SAC was filed. Plaintiff either is to agree to the dismissal of these unserved defendants or show cause why dismissal should not occur.

Since summary judgment has been granted in favor of the Defendants who have appeared in this case, the trial date will be vacated.

Accordingly, IT IS HEREBY ORDERED that:

1. Defendants' motion for summary judgment regarding standing to sue for the death of Ryan is DENIED;
2. Defendants' motion for summary judgment regarding the negligent provision of Elavil is GRANTED;
3. Within fourteen (14) days of service of this order, Plaintiff is to either stipulate to the dismissal of the unserved defendants or show cause why dismissal should not occur; and
4. The September 5, 2008, pre-trial conference and the October 21, 2008, trial dates are VACATED.

IT IS SO ORDERED.

**Dated: September 2, 2008** **/s/ Anthony W. Ishii**
CHIEF UNITED STATES DISTRICT JUDGE